# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

  v.                                        **Case No. 12-CR-122**

**DONAVEN JACKSON**
        **Defendant.**

## DECISION AND ORDER

The government charged defendant Donaven Jackson with possessing ammunition as a felon, contrary to 18 U.S.C. § 922(g)(1). Defendant moved to suppress evidence seized from his home pursuant to a consent search and from his cell phone pursuant to a search warrant. He argued that his ex-girlfriend lacked authority to admit the police into his home and that the warrant did not authorize a search of the contents of his phone. A magistrate judge held an evidentiary hearing on the consent issue and recommended that defendant's motion be denied. Defendant objects, and I now consider the matter de novo. See Fed. R. Crim. P. 59(b).

### I.  FACTS[1]

On May 7, 2012, City of Kenosha police officers Knight and Torres responded to a domestic violence complaint from Shantrice King at 7104 37th Avenue. (R. 19 at 1 ¶ 2). Defendant was the lessee of the residence located at that address. His was the only name on the lease. The lease specified that the premises were to be used as the residence of

---

[1]The parties stipulated to certain facts before the magistrate judge. (July 31, 2012 Letter [R. 19].) Other facts stated herein are drawn from the exhibits and testimony presented at the hearing. Neither side requests a de novo evidentiary hearing, and I find the record made before the magistrate judge sufficient for de novo review. See United States v. Raddatz, 447 U.S. 667 (1980).

defendant and his two minor children; it prohibited occupancy by guests for more than two weeks absent the landlord's written consent. (8/1/12 Evid. Hr'g Tr. [R. 24] at 45-47; Hr'g Ex. D-2.)

Outside the residence, the officers encountered defendant, King, their two or three year old child Jamauri and King's friend Jamaica Presha. Torres noticed a small rip in the back of defendant's T-shirt. (R. 19 at 1 ¶ 2.) King told Knight that defendant had directed her to move out of the residence and that he began removing her clothes from a closet on the second floor. She then followed him upstairs, and the two argued. Defendant went downstairs to the dining room and began to take keys off King's key ring. King snatched the keys from defendant, and defendant grabbed her by the face and neck and pushed her against the wall. King resisted and grabbed defendant's shirt. Defendant then pushed King over a love-seat, and King called 911. While King was on the phone, defendant went downstairs and returned with a firearm but King did not see what he did with it. Defendant did not have the gun when the police arrived. (R. 19 at 1-2 ¶ 3; Ex. B at 6.) Upon arrival, Knight observed that King was shaking, appeared nervous and had a cut on her finger; however, he saw no marks on her face or neck.[2] (R. 19 at 2 ¶ 5.)

After the interview, Knight and King looked for the gun but did not find it. The police arrested defendant and subsequently discovered that he was a felon. Knight then called King and asked her to try to find the gun and to call him if she found it. King, who was not at the

---

[2]Presha told Knight that when she walked into the house she heard defendant and King fighting upstairs. She then observed them come downstairs. Defendant went to King's keys and started taking keys off the ring; King tried to get the keys, and defendant pinned her to the wall. King fought back, and defendant pushed her over the love-seat. Presha then picked up the couple's son and went to the second floor. (R. 19 at 2 ¶ 4; Ex. B at 5.)

2

residence when she received the call, did not call Knight to report finding the gun. (Id. at 2 ¶ 6.) Detective Johnson then took over the domestic violence matter, reviewed Knight's report and King and Presha's witness statements, and spoke to Torres. (Tr. at 11-12.) Knight's report listed King as the complainant and stated that she, Jamauri and Presha lived at 7104 37th Avenue. (Tr. at 14-15; Ex. B at 1-2.) However, in her statement, Presha listed a Sycamore, Illinois address. (Ex. B at 5; see also Tr. at 36.) Johnson asked Torres to prepare a report based on his interaction with defendant. In that report, Torres stated that defendant "denied striking his live-in girlfriend, Shantrice King" and "said he did not touch her other than to push her away when he tried to get his keys." (Ex. B at 11; see also Tr. at 17.)

The next day, May 8, Johnson called King and asked her if the police could come to the 37th Avenue residence to look for the gun. (Tr. at 18.) King was not at the residence when she received the call. She agreed to meet Johnson at the residence at 5:00 p.m. (Id. at 19.) When Johnson arrived at the residence, King was not there. She subsequently arrived in a vehicle accompanied by Jamauri and Presha. (Id.) The residence has an enclosed front porch through which one can enter a living room through a wooden door. (Id. at 21-22; see also Ex. C, a photo of the front entrance.) King and Johnson entered the porch through an unlocked door, and King then used a key to unlock the wooden door. (Tr. at 22.) At that point, Johnson stated that the police wanted to look for the handgun and asked King to consent to a search of the home. (Id. at 24.) Johnson testified that:

> . . . when I search a home, of course, the first thing I want to do is establish that the person that I'm asking for consent from lives there. And in this case she indicated she did. And from there I go on to explain the form that I fill out and the consent form, and eventually ask for her to sign the form giving us consent to search.

(Id.) King consented to a search of the premises and signed a consent form. (Id. at 25; Ex.

3

A; R. 19 at 2 ¶ 7.) Johnson advised police officer Schaal and three assisting officers to look for the gun. (Tr. at 26.)

Schaal noticed some boxes, bags and children's toys on the porch. (Id. at 42.) The living room was empty except for an entertainment center with a large-screen TV, some DVDs, movies and games. (Id. at 42-43.) In the basement, Schaal noticed a mat reading "Snoop's man cave." He knew that defendant's nickname was "Snoop." (Id. at 43.) In the basement, in a living area with a couch and television, officers recovered ammunition, a quantity of crack cocaine, drug paraphernalia, a gun lock and personal effects but no gun. (R. 19 at 2 ¶ 8.)

After assisting with the search, Johnson spoke again with King. She told him that she had lived at the residence for about a year with defendant and their son.[3] (Tr. at 27.) She stated that she had full access to the home including the man cave area in the basement.[4] (Id. at 28.) The officers asked King if there were other areas where defendant might have hidden the gun, and she mentioned the garage. (Id.) Officers searched the garage locating a 2006 Chrysler 300 Sedan registered to a Tasha Booker. King told officers that defendant owned the car and gave them a key. The officers searched the vehicle and found money in the glove box and trunk but no gun. (R. 19 at 2-3 ¶ 9.) Schaal observed a red Jeep Cherokee parked in front of the residence which King said belonged to defendant. The officers then obtained and executed a search warrant for the Jeep but did not find a gun. (R. 19 at 3 ¶¶ 10-11.)

On May 10, officer Viola obtained a search warrant for a cell phone taken from

---

[3]Johnson confirmed on cross-examination that this conversation occurred after the search had commenced. (Tr. at 35.)

[4]Also after the search had commenced, King told Schaal that she had access to the entire basement because the laundry room was located just off the basement rec room. (Id. at 43-44.)

4

defendant after his arrest. The phone was with defendant's other personal property at the Kenosha detention center. (R. 19 at 3 ¶¶ 12-13.) In his supporting affidavit, Viola relied on evidence gathered during the search of defendant's home. (Ex. D-3 at 6.) A court commissioner issued the warrant,[5] but the phone was password-protected causing the officers to download the contents of the phone's SIM/Memory Card onto 3 CDs and log them in evidence. (R. 19 at 3 ¶¶ 14-17.)

## II. DISCUSSION

**A.   Consent Search of a Home**

   **1.   Applicable Legal Standards**

Warrantless searches of a home are presumptively unreasonable. E.g., Payton v. New York, 445 U.S. 573, 586 (1980). However, the Fourth Amendment accommodates consensual searches as a voluntary consent "lifts" the warrant requirement. United States v. Stribling, 94

---

[5]The warrant read, in pertinent part:

WHEREAS, I, Officer Leo Viola #512 has this day complained in writing to the said Court upon oath that on the 10th day of May 2012, in Kenosha County, in and upon certain premises described as follows: 1000-55th Street, the Kenosha Public Safety Building, Evidence Bureau

there are now located and concealed certain things or persons or other items of evidence, namely: a black HTC Sprint Model# PC36100 Ser.# HT15LHL11693, believed to contain stored data such as call logs, contacts, text messages, history of drug transactions or photos of narcotics or weapons.
. . .
NOW, THEREFORE, in the name of the State of Wisconsin you are commanded forthwith to search the described premises and to bring the persons and/or items of evidence and the person in whose possession the same are found, and return this warrant within 48 hours before the Circuit Court of Kenosha County, to be dealt with according to law.

(Ex. D-3 at 1-2.)

F.3d 321, 342 (7th Cir. 1996). The government bears the burden of proving consent by a preponderance of the evidence. United States v. Jackson, 598 F.3d 340, 346 (7th Cir. 2010).

A third party cannot consent to a search of another's home unless the third party possesses common authority over, or other sufficient relationship to, the premises. United States v. Ryerson, 545 F.3d 483, 488 (7th Cir. 2008). The consent of a third party who possesses or appears to possess common authority is valid as against the absent, non-consenting person who shares such authority. Jackson, 598 F.3d at 346 (citing Georgia v. Randolph, 547 U.S. 103, 110 (2006); United States v. Matlock, 415 U.S. 164, 170 (1974)). Actual or apparent authority will suffice for a consent search. United States v. Chaidez, 919 F.2d 1193, 1201 (7th Cir. 1990). In the present case, defendant contends that King had neither.

Actual authority does not depend on property law distinctions but on whether there is "'mutual use of the property by persons generally having joint access or control for most purposes.'" Ryerson, 545 F.3d at 487 (quoting Matlock, 415 U.S. at 171 n.7). The idea is that when a person shares space, he "assumes the risk" that his co-habitant might consent to a search, at least of common areas and areas to which the other has access. See United States v. Ladell, 127 F.3d 622, 624 (7th Cir. 1997); United States v. Duran, 957 F.2d 499, 504 (7th Cir. 1992).

Apparent authority exists when, prior to commencement of the search, the facts are such that a person of reasonable caution would believe that the consenting person had authority over the premises. Ryerson, 545 F.3d at 489; see also Illinois v. Rodriguez, 497 U.S. 177, 186 (1990) ("The Constitution is no more violated when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to

6

their entry is a resident of the premises, than it is violated when they enter without a warrant because they reasonably (though erroneously) believe they are in pursuit of a violent felon who is about to escape."). This does not mean that the police may assume authority whenever they are invited inside. "Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." Rodriguez, 497 U.S. at 188; see also United States v. Alexander, 573 F.3d 465, 474 (7th Cir. 2009) (noting that an officer has a duty to inquire further as to a third party's authority to consent to a search if the surrounding circumstances make that person's authority questionable).

Facts that suggest a finding of actual or apparent authority include: (1) possession of a key to the premises; (2) the person's admission that she lives at the residence in question; (3) possession of a driver's license listing the residence as the driver's legal address; (4) receiving mail and bills at that residence; (5) keeping clothing at the residence; (6) having one's children reside at that address; (7) keeping personal belongings such as a diary or a pet at the residence; (8) performing household chores at the home; (9) being named on the lease and/or paying rent; and (10) being allowed into the home when the owner is not present.[6] United States v. Groves, 470 F.3d 311, 319 (7th Cir. 2006); see also United States v. Saadeh, 61 F.3d 510, 517 (7th Cir. 1995) ("To assess whether apparent authority exists, we look for indicia of actual authority."). Facts that come to light after the search began cannot reasonably have influenced the officers' beliefs regarding apparent authority, Groves, 470 F.3d at 319, but they can be relevant to whether the person had actual authority, United States v. Groves, 530 F.3d

---

[6]Groves did not create a ten-factor test for determining authority to consent; rather, it collected relevant factors from previous cases. Ryerson, 545 F.3d at 490.

506, 510 n.1 (7th Cir. 2008).

    **2.**    **Analysis**

        **a.**    **Actual authority**

Because actual authority does not rest on property law distinctions, the fact that defendant was the sole leaseholder does not mean that King, who had lived with him and their child at the residence for about a year, could not consent to an entry. See, e.g., Ryerson, 545 F.3d at 487-88 (finding actual authority where the defendant's girlfriend and their child had lived with him at the subject residence for ten months before the search and explaining that the defendant assumed the risk that his girlfriend, who continued to use the property to store her personal belongings and records for their co-owned business, would return after she left following an argument); see also Jackson, 598 F.3d at 347 (collecting cases).

In the present case, however, defendant revoked King's permission to remain in his home and thus terminated the risk that he had assumed. Cf. Ryerson, 545 F.3d at 485 (referring to the girlfriend's continuing residence in the defendant's home). He did so unequivocally. He ordered King (and her friend) to go, removed her clothes from a closet and attempted to retrieve his keys to the house. When King snatched the keys back from him, he allegedly assaulted her. To establish a valid consent, the government must establish by a preponderance of the evidence that defendant authorized King to remain in the residence. The government presents no evidence that at any time after ordering King to leave defendant changed his mind and authorized her to remain in the house. Nor does the government present any evidence that King had any other lawful basis for remaining. Cf. id. at 488 (rejecting, based on a note the defendant wrote to a jailor suggesting that he still considered

8

her a lawful co-habitant, the defendant's claim that he revoked the girlfriend's actual authority after she left).

The government speculates that King's ejection may have been temporary, a heat of the moment thing resulting from a domestic dispute. While people in stressful situations sometimes says things they later retract, there is no evidence of this in the present case. Cf. United States v. Penney, 576 F.3d 297, 309 (6th Cir. 2009) (finding apparent authority where, although the defendant had ejected his girlfriend from his home just prior to the consent search at issue, the police knew from past experience that the couple frequently quarreled and reconciled and had no reason to think the situation was different); Ryerson, 545 F.3d at 487 (finding actual authority where, although the defendant's girlfriend had left the home at the time of the search, the defendant did "not claim that he kicked her out of the house; rather, she appears to have left on her own accord after a tiff with him").[7] Speculation is insufficient to establish King's authority to consent.[8]

The government contends that, if defendant really wanted King out, he could have used his superior size to remove her clothes from the house, take back his keys and force her to go. Apparently, defendant did try to retrieve the keys but King snatched them, leading to a physical altercation.[9] Aside from the questionable nature of the government's argument that defendant should have relied on force, authority to consent cannot rest on the consenting person's

---

[7]Nevertheless, the Ryerson court found it "a close case." Id. at 485.

[8]In its response to defendant's objection, the government questions the authenticity of defendant's lease. However, it presented no evidence supporting this argument, and the magistrate judge admitted the lease in evidence without objection. (Tr. at 48.) Thus, I have no reason not to treat the lease as valid.

[9]Defendant faces charges in state court based on his alleged assault of King.

9

retention of a leaseholder's keys following an altercation. Imagine a woman evicting her live-in boyfriend and attempting to take back a key to her house, but the boyfriend wrestles it away by force. Would society recognize the boyfriend's authority to later use the key to admit others to her home? Indeed, the Supreme Court has recognized that unauthorized retention of a key cannot give rise to actual authority. See Rodriguez, 497 U.S. at 181-82 (finding no actual authority where the defendant's ex-girlfriend had taken a key without his knowledge).[10]

### b. Apparent authority

The government relies primarily on apparent authority to sustain the search, arguing that it was reasonable for Johnson to accept King's assertion that she lived at the residence. The government contends that the police had no reason to question this assertion because King's statement about defendant's assault on her was credible in that it was corroborated by Presha and by the rip in defendant's shirt and the cut on King's hand. But the issue is not whether King's complaint that defendant assaulted her was credible but whether it was reasonable for the officers, who knew that defendant had kicked King out of his home, to believe that King

---

[10]Although it is not necessary to run through all of the Groves factors, doing so strengthens the conclusion that King lacked actual authority. King possessed a key, but she retained it without defendant's permission. King told the police that she had lived at the residence for about a year, but she also told them that defendant had kicked her out. King also claimed that she had full access to the home, but that statement must be considered in the context of her eviction. There is no evidence that King listed defendant's address on her driver's license or that she received mail at his residence. King mentioned that she had clothes at the residence, but she also indicated that defendant removed them from the closet, and the officers saw boxes and bags on the front porch and a barren living room. Nothing in the record suggests that during the search the officers saw female clothing or other items indicative of a female occupant. Nor does the record contain any evidence that King kept personal belongings such as a diary or pets at the house. King did say that she had lived in the residence with her and defendant's child, and the officers saw some toys on the front porch. However, the lease indicated that defendant's two sons could live in the house. Moreover, this does not change the fact that defendant told King that she had to go. Finally, the lease was in defendant's name, and there is no evidence that King ever paid rent.

10

retained authority to consent to a search of it. And King's statement about what happened between defendant and herself, however credible, <u>weakens</u> her claim to such authority: King told the police that defendant ordered her to move out, removed her clothes from a closet, attempted to take back her key and assaulted her when she wouldn't give it up. Thus, before they commenced their search, the police knew that defendant had ordered King out and that she possessed a key only because she had fought off defendant's effort to retrieve it. These facts do not suggest that King was authorized to consent to a search of defendant's home.

The officers were also aware of other facts raising red flags. When Knight called King to ask her to look for the gun, she was not at defendant's home. Nor did she find the gun. Likewise, when Johnson called King to set up a search, King was not at the residence. And when Johnson met King she did not come from inside the house; rather, she, Jamauri and Presha arrived in a car suggesting that the three of them were residing elsewhere. <u>Cf. Ryerson</u>, 545 F.3d at 485 (finding actual and apparent authority when the defendant's girlfriend left their daughter and her belongings behind after she left). Further, the officers found boxes and bags on the porch and virtually nothing in the living room, indicating that someone had or was moving out.

Finally, it is important to note what the police did <u>not</u> know at the time King consented: they did not know how long King had lived at the residence, whether she was a co-owner or co-lessee, whether she paid any portion of the rent, or whether she performed any household chores. And they didn't ask. Nor did they check King's driver's license or mailing address. Despite the many signs that King no longer lived at the residence, the police made no serious inquiry into her authority. Had they made such an inquiry, they would have discovered that defendant was the sole lessee and that he had a right to revoke her shared authority over the

11

premises. King said nothing suggesting the contrary.

United States v. Goins, 437 F.3d 644 (7th Cir. 2006) offers an example of the sort of careful inquiry that the officers should have made. There, the defendant's girlfriend called the police after an argument, claiming that he had assaulted her and requesting a police escort to gather her belongings. Id. at 645. An officer met the girlfriend outside the defendant's residence and took her to a nearby police substation. At the substation, she told the officer that she had been dating the defendant for approximately five months and had been living with him at his residence on-and-off for several months. She showed the officers a key to the home and reported that she performed household chores for the defendant such as cleaning, cooking and doing laundry. She also stated that she had clothing and household items at the defendant's residence and wished to get them that evening because she intended to move out. Id. at 646.

After the girlfriend mentioned that the defendant kept drugs and a gun at his house, the officer contacted a drug investigator, and the girlfriend repeated her connection to the defendant's home to the investigator: she had a key to the apartment, she had been staying there for several months, and she did various household chores, including laundry, cooking and straightening up. Id. Officers took the girlfriend to the residence, where she admitted them with her key. Prior to commencing a search, however, the officers double-checked her connection to the residence: she showed the investigator her key, repeated that she had personal belongings in the house and showed him some of her belongings. She also stated that she cooked for the defendant, had free rein of the house except for the attic and was in the process of arranging to have her mail delivered to his residence. Even then, prior to commencing a search, the investigator contacted the district attorney's office about a warrant but was told that the girlfriend could provide a valid consent. Id. at 647.

12

Under these circumstances, the court had little difficulty in finding that the officers satisfied their duty of inquiry:

> [T]his was not a case of officers blindly accepting a person's claim of authority over a premises in order to create apparent authority to search. Several officers questioned [the girlfriend] regarding her access to the apartment, and her answers remained consistent. She had a key to the apartment, possessions within the apartment, and represented that she lived there on-and-off and frequently cleaned and did household chores in the home. She also claimed that she was allowed into [the defendant's] residence when he was not home. These representations paint a believable and reasonably complete picture of [her] actual authority to search. [The investigator's] telephone call to the ADA further demonstrates the officers' good faith.

Id. at 649.

In the present case, conversely, the officers asked only if King lived at the residence. Despite the red flags raised by the circumstances leading to defendant's arrest and the officers' own observations, they asked King nothing about her connection to the premises. Nor did they conduct any independent investigation such as, for example, contacting the landlord or checking utility records. It is also worth noting that no exigency required the police to proceed as they did. The police could easily have obtained a warrant to search the house as they did for the Jeep parked outside. Cf. Ladell, 127 F.3d at 624 (noting that the officers obtained consent during an ongoing domestic violence incident in which the defendant's sister and mother feared he would shoot someone). In sum, the government fails to meet its burden of showing by a preponderance of evidence that the facts were such that a person of reasonable caution would believe that King had authority to consent to a search of defendant's residence.

**B.    Search Warrant for the Phone**

The Fourth Amendment requires that a search warrant contain a particular description

13

of the place to be searched and the persons or things to be seized. E.g., Maryland v. Garrison, 480 U.S. 79, 84 (1987); United States v. Jones, 54 F.3d 1285, 1289-90 (7th Cir. 1995). Defendant notes that the warrant allowed the officers to search the evidence bureau and seize his cell phone but not to download its contents. See United States v. Payton, 573 F.3d 859, 864 (9th Cir. 2009) (holding that the search of a computer without explicit authorization in the warrant exceeded the scope of that warrant); see also United States v. Flores-Lopez, 670 F.3d 803, 805 (7th Cir. 2012) (stating that "a modern cell phone is a computer"). Though the officers ostensibly wanted – and the court commissioner may have believed he was granting – permission for the latter, the warrant authorized only the former. See Payton, 573 F.3d at 862 (holding that after-the-fact testimony as to the issuing judge's intent could not cure the failure of the warrant to authorize the search of computers).

The government responds that, read in a common sense fashion, the "premises" referenced in the search warrant meant the cell phone; the police would not need a warrant to search their own evidence bureau. Even if the warrant did not actually authorize a search of the phone, the officers could in good faith have believed that it did. See Garrison, 480 U.S. at 87 (recognizing "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of . . . executing search warrants"); see also Massachusetts v. Sheppard, 468 U.S. 981, 988 (1984); United States v. Aljabari, 626 F.3d 940, 947 (7th Cir. 2010), cert. denied, 131 S. Ct. 2164 (2011).

As defendant noted in his post-hearing brief before the magistrate judge, because the police relied on evidence seized from his home to establish probable cause for the warrant, the subsequent search of the cell phone was derivative of the residential search. (R. 29 at 1 n.1.) Having concluded that the residential search violated the Fourth Amendment, I am uncertain

whether, removing from the application the evidence unlawfully obtained, a sufficient basis to establish probable cause for the issuance of a search warrant remains.  See Segura v. United States, 468 U.S. 796, 814-15 (1984); United States v. Markling, 7 F.3d 1309, 1315 (7th Cir. 1993).  At the conference scheduled for December 20, I will give the parties an opportunity to address this issue, as well as whether the search of the cell phone still matters.

### III.  CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion (R. 14) is **GRANTED** in part as stated herein.

Dated at Milwaukee, Wisconsin, this 17th day of December, 2012.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge